Now, somebody here is a student, is that right? You're the student. That would be me, Your Honor. Well, we're honored to have you here. It's a pleasure. We always appreciate having budding barristers. We sometimes see some excellent presentations, and I'm confident you'll be one of them. Thank you, Your Honor. So please proceed. Your Honor, my name is Adam Rust, along with my co-counsel, Evangeline Averill. On behalf of the petitioner, Mr. Haji Drammeh, at this time I would like to reserve two minutes for rebuttal. I'd like to start with a threshold question. I noticed at the beginning of your brief you made statements, to the best of counsel's knowledge, Mr. Drammeh is not detained. To the best of counsel's knowledge, Mr. Drammeh has no pending application for adjustment of status. Now, we've had some issues in the past with the clinic not actually being in contact with the client. So I was concerned when I read those statements and wanted to know what your contact with your client has been. Certainly, Your Honor. Our client, our contact with our client was actually as recent as today. Actually, the client's brother. He was planning on coming down for oral arguments, but couldn't afford the plane ticket from Seattle. So that is his current status. Presumably, since he was planning on coming down, he's not detained. So is he detained? He's not? Again, since he was planning on coming down, our understanding is he was not detained. He's currently living with his family, has not been detained, and presumably is free to move about the circuit. But you've been in contact with him in answer to Judge Yakuta's question. Have you spoken with him personally? Personally, no. My co-counsel has. She has? Yes. OK. How long ago? Your Honor, I've spent with Mr. Drammeh's brother. No, not with his brother, but with him. I only with his brother because Mr. Drammeh doesn't speak to any questions. I spent with his brother yesterday and also about three days ago. Have you ever spoken with him, with the client? No, Your Honor, but I have had correspondence with him. He has responded to letters that he sent. And is he in detention? No, Your Honor. Please proceed. Thank you, Your Honor. During the RUF's five-month imprisonment and abuse of Mr. Drammeh, they told him the abuse would cease if he would join them as a committed soldier. Mr. Drammeh, knowing the abuse would continue, said no. Faced with this record, the IJ and BIA erred in two distinct ways. First, they erred in failing to find a nexus between Mr. Drammeh's political neutrality and his persecution. And second, they failed in failing to consider humanitarian asylum in spite of clear regulatory requirements. To the first point, the standard for political neutrality is set out in Sangha versus INS. Political neutrality is set up when an individual states political neutrality in an environment where stating that political neutrality would be fraught with hazard. They can do that expressly or through action. They can do that. They must do it with a conscious and deliberate will. In this case, Mr. Drammeh stated his desire to remain neutral explicitly to the RUF forces on several occasions throughout his five-month imprisonment. He did this in the face of continued abuse and persecution,  in his desire to stay out of the fray, to not join and commit more to the RUF as a committed soldier. So we've said that showing political neutrality requires some pretty specific acts. It's a conscious, deliberate choice. He must not merely avow his political neutrality, but he must show that the opinion was articulated sufficiently. So it was really an express statement of neutrality, not just a, I don't want to fight, which Elias Akariah said was not enough. So where in the record can you point me to where there is evidence or testimony of specific action saying, I am a neutral in this, I am not going to fight? Two specific instances, Your Honor. Page 79 and 160 of the record, the administrative record, Mr. Drammeh says, they asked me to join them, and I said no. Furthermore, at page 81 of the administrative record, the RUF told Mr. Drammeh, this abuse will end if you agree to join us. And again, knowing the abuse would continue, this Mr. Drammeh still said no. I'm sorry, go ahead. I have to say, I'm confused by your argument about this now. I thought you were talking about the fact that he was Muslim, that his father was Muslim, and he was killed. What is the point here? Which is the point? You're going exclusively on political neutrality? Is that what you're going on? Both political neutrality and imputed political opinion, Your Honor. On the issue of the ---- But not religion? Not religion, Your Honor, no. That's a switch, right? It's not a switch in the sense that his Muslim faith motivated his political neutrality. In the administrative record, Mr. Drammeh states that his father was motivated to have his son stay out of the war because of his Muslim faith, which can be peaceful. Let me be sure I understand that. Are you saying that it's part of the Muslim faith not to fight people? It was part of Mr. Drammeh's Muslim, articulated Muslim faith to fight. I can say that's ---- I read the Koran. I didn't see that anywhere. Of course, this is not a religious discussion, but I ---- is that your point? That was what Mr. Drammeh testified to at the IJ level, and there was no adverse credibility finding. And that is the best that can give me that. But all he just said, he didn't want to fight. He didn't say why. Well, he said no in the face of continued persecution. There was a heightened risk because he was under the exclusive control of the RUF. I understand that. But Judge Ikuda made it clear from the case that she cited that there's certain showing that you have to make in order to substantiate a claim of political neutrality. Yes, Your Honor. In what way did his answer at AR-79 and what was the other one, 81, address that? The no has to be seen in the context of him being under the exclusive control of the RUF. In Alia Zacharias, Justice Scalia says that one of the concerns about political neutrality or wishing to stay out of civil war is that there needs to be a distinguishing factor between indifference, indecisiveness, or risk averseness. In other words, the facts need to show that there's something more that the applicant did that distinguishes it from just, oh, I don't want to do this because I have better things to do. Or I just don't want to fight. Or I just don't want to fight, exactly. And in this case, Mr. Drama was, again, under the exclusive control of the RUF. He was being held hostage. He was bound. What's the difference between that and Alia Zacharias? Maybe you could distinguish, because he also said, I refuse to join the guerrillas. And the Supreme Court said he has to show that it was – that doesn't show that was on account of political opinions. Certainly, Your Honor. The key distinguishing factor between Alia Zacharias in this case is that in Alia Zacharias, Mr. Zacharias never actually confronted the rebels. He was in another room. The rebels came at night. They talked to his parents. They said, we're looking for your son. And they said, he's not here. And he went, oh, my gosh, they're going to get me. I've got to leave the country. In this case, Mr. Drama didn't leave the country. There was no speculation that harm might occur. He faced continued and systematic harm under the exclusive control of the RUF for a five-month period. This – the fact that he is his – Why does the exclusive control make a difference? I mean, if he doesn't have a political opinion or they're not imputing a political opinion, they want him to fight and he doesn't, I guess I don't understand how exclusive control makes any difference. The exclusive control makes a difference, Your Honor, because being under their exclusive control precludes his no from being just the result of indifference, indecisiveness, or risk averseness, as stated by Justice Scalia. Every time Mr. Drama said no, he knew what would follow. Furthermore, the rebels informed him the abuse would end if he would commit to being a soldier in their cause. Therefore, the exclusive control – But you can't be risk averse because you don't want to be a soldier? I think he was left at home and was the cook. Is that the – Well, it was more – certainly he was serving as cook, but he was also being bound up. He was also being beaten. He also had his arm broken. He also was being fed just the barest amount of scraps of food to survive during this five-month period and wasn't liberated until the Guinean soldiers and U.N. forces came in, in 2000, to liberate him. But moving on to the issue of nexus for the asylum claim, the relevant standard here because of a – because there was not an adverse credibility finding is de novo, following this Court's precedent in Singh v. Elchert, which was recently upheld as the right rule in Boghossarian v. Holder. That's a 2010 Ninth Circuit decision. But even if we assume the government's argument of substantial evidence, while there's a heightened standard of proof, it's applied – there's a heightened standard of review, it's applied to a low standard of proof. So even assuming substantial evidence, the standard would be, would a reasonable fact finder be compelled to find it was reasonable to believe that the persecutors were motivated, at least in part, by a protected ground? Do you want to save any of your time? You're down to a minute and a nine. If you don't have to, but if you want to, you want to. Certainly, I – briefly, I would like to jump ahead to the humanitarian asylum. Okay. That's fine. It's your time. On the exhaustion claim, the government has said that the humanitarian asylum claim was exhausted. Under the regulatory scheme 1208.13b11, it states, before it even gets into the issue of future persecution, this is except as provided in paragraph b13. So in other words, the humanitarian asylum consideration is part and parcel of the future persecution consideration. By pleading humanitarian asylum, proving past persecution, you reach the standard of being able to be considered for humanitarian asylum. This case is analogous to Sobey v. Mukasey, where an individual was recruited by the RUF for multiple times, totaling 15 days. His parents were murdered. In this case, Mr. Drommel was in prison for a total of five months. His father was murdered. Therefore, it falls well within the ambit for remand for further consideration on the basis of humanitarian asylum. And I see my time is up. Thank you. As indeed. Okay. Thank you very much for your presentation. Let's hear from the government. Good morning, Your Honors. May it please the Court. My name is Julia Jones. I represent the Attorney General of the United States. What's important to note is what's properly before the Court and what's not properly before the Court. Petitioner did not raise before the Board this claim, and I'm a little confused by what the claim is. I think it's changed today. But in the brief, it says, a religiously motivated, political, neutral opinion. And that claim was never brought before the Board. And an applicant's failure to raise a claim to the Board generally is a failure to exhaust that claim, and the Court doesn't have jurisdiction to review that claim. So, in his brief to the Board, what he stated was that he had, he asserted that the RUF persecuted him on account of an imputed political opinion, and the way it was defined is that his Muslim faith was shared with the faith of the President of Sierra Leone, and therefore the RUF imputed upon him the same political views that the President of Sierra Leone had. That was the argument brought before him. Based upon his religion, right?  And that's the argument he brought before the Board. In the brief, there's this brand new argument that, of this political neutrality. And political neutrality and imputed political opinion are separate and distinct. And in this Court's decision in Sanga, it specifically said that there are three different ways to establish your political opinion. One, you firmly have an opinion. Two, you're politically neutral and you've espoused those views. Or three, you have a political opinion that's imputed to you. So Petitioner can't conflate the two and say it's an imputed political opinion. It's one or the other. And the fact of the matter, he never raised before to the Board the issue of this political neutral opinion. Therefore, it's not properly before the Court. Kagan, so what do we make of the fact that Mr. Graman never voted, was not at all political? Why isn't this some evidence of political neutrality? Because he never voted and he never ran. I mean, that's the whole point. This Court stated that you have to have a conscious and deliberate decision to be politically neutral. You have to espouse that political neutrality. And the record shows, and the record that counsel cited at page 7880, he said the REF attempted to recruit him because he was young. And he refused. To me, that's the classic risk averseness. We don't – there's no evidence to compel the conclusion that he was politically neutral. He never stated that he was politically neutral. He never said he had a political opinion at all. Political neutrality can't mean it's just not having a political opinion. You have to express in a conscious and deliberate way that you have this neutral opinion that is not taking sides. And the persecutor must be aware of that political neutrality and be persecuting on account of that political neutrality. We don't have any of that here in this strict right case. Petitioner's testimony and his application said the REF were looking for young men to recruit. He said no. That's all the information that we have. So even with regard to his imputed political opinion, we are – we don't know what political opinion that the REF imputed upon him. All we know is they were looking for young men. He said no. They detained him. He said – he refused to say no. For all we know, it is risk averseness. And because the evidence – the standard of review contrary to counsel is substantial evidence and you have to be compelled to conclude to the contrary of what the board says, there is no evidence to conclude that the board was incorrect in this case. And that's – therein lies the rub in this case, right? There is substantial evidence from the government's perspective as to its findings and there is no evidence, one way or another, on the opposite side, right? Right. And there are no – there is no evidence, period. And so all you have is his testimony and his application stating that. So with regards to that, then the board was correct to determine that there is no nexus here. He hasn't established that REF persecuted him on account of any of the statutory protected grounds, whether it's imputed political opinion or religion or whatever it may be. He's failed to establish the requisite nexus in this particular case. And with regards to humanitarian claim, we also say that this is an unexhausted claim. You have to have this – you have to establish past persecution. You can't just jump to humanitarian asylum. You have to have this egregious past persecution. And in some – and at some aspect, the Court says that that – that leap to humanitarian asylum is in all those – in those instances, excuse me, where the past persecution is insufficient, and yet, based upon the seriousness of what occurred, then the board or the IJN is discretionary in humanitarian asylum. And it's an unexhausted claim that's never been presented to the board in the first instance. Does the Court have any other questions? I think not. Thank you. Thank you both for your argument. We appreciate it very much. The case of Drama v. Holder is submitted. My colleague, who used to be the dean of the USC Law School, suggests that even though you exhausted your time, that we should give you some extra time. So we will do so. Okay. How about a minute? How would that be? Okay. Come on up. As they say in some places, come on down. Two points on rebuttal, Your Honor. The first, the government's assertion that the claim for political neutrality was not exhausted below is – flies in the face of this Court's opinion in Cruz-Navarro v. INS, in which this Court stated that after a claim has been – if a claim has been brought up below in a way that was substantially similar to a claim that could be brought on appeal, that claim should be considered. In this case, at page 35 of the administrative record, the IJ states that the – that Mr. Drama stated that he continued to say no in the face of five months of persecution. This is substantially similar to a claim of political neutrality and, therefore, was not exhausted. Second, he said that he's – well, he did say they were looking for young men. He said that was one of the things they were looking for. And the facts show this. There's a distinction once they enter the camp between those who said yes and those who said no. Those who said yes got to beat those who said no, and those who said no faced continued abuse, as Mr. Drama did for five months. I see my time has expired. Thank you. Roberts. Thank you again for your argument, counsel. The case of Coma v. Holder is submitted, and the Court stands in recess for the day.
judges: Nelson, Smith, Ikuta